Margaret Reyes v. San Francisco Unified School District                    Lisa Levin

1

2                    UNITED STATES DISTRICT COURT

3                  NORTHERN DISTRICT OF CALIFORNIA

4

5    MARGARET REYES,

6              Plaintiff,

7    Vs.                              No. C11-04628 YGR [ECF]

8    SAN FRANCISCO UNIFIED SCHOOL
     DISTRICT,

9
               Defendant.
10   _____/

11

12

13           DEPOSITION OF:  LISA LEVIN

14           TAKEN ON:       JULY 18, 2012

15

16

17

18

19

20

21        13168                      ERIN SHANNON

22                                   CSR No. 11355

23

24

25

                                                              1

1      Q.   So you decided that she needed to see it

2   being done the first session and the second session

3   with the kids.   Right?

4      A.   Multiple sessions.

10:58:50  5      Q.   All right.   The third session, the same

6   thing?

7      A.   The third session she -- what I recollect,

8   but I don't have full memory of what happened during

9   the third session at all, is that she played a

10:59:05  10   certain role.   So, for example, like, we sat side by

11   side during the mini lesson, and I taught some of the

12   components, and she taught maybe one of the

13   components.

14      Q.   All right.

10:59:20  15      A.   So we -- we -- it's called a jigsaw.

16      Q.   What did she teach?

17      A.   I don't remember.

18      Q.   How did she teach?

19      A.   I don't remember.

10:59:28  20      Q.   Okay.   Fourth session, what do you recall

21   about that?

22      A.   I don't have any recollection.

23      Q.   All right.   Do you have any recollection of

24   observing her teaching?

10:59:41  25      A.   I have a recollection of observing her in

32

1    the classroom but not teaching, more trying to manage

2    the students.

3         Q.   Okay.  So you came into the classroom to do

4    your reading workshop with the kids.  Right?

11:00:02   5         A.   Uh-huh.

6         Q.   So what did you observe about her managing?

7         A.   What I observed is that there was no

8    structure in terms of the management.  There wasn't a

9    routine for, like, how kids would come to the carpet.

11:00:20  10    There weren't procedures for students using the

11    restroom.

12         When I would walk into the classroom before

13    I would teach, there would be students doing a

14    variety of different things.  So some appeared to be

11:00:35  15    doing what she was finishing up, whether that was

16    copying, like, doing spelling work or whatever.

17         There was one child I recall playing with

18    Legos instead of doing the learning that was being

19    asked of him.

11:00:53  20         There were students who had a difficult time

21    emotionally, like, staying calm.  There were students

22    who used the restroom, like, multiple times within --

23    within an hour and would leave the classroom and

24    would -- from my position would seem to be gone for,

11:01:15  25    like, a long period of time.

                                                              33

1          There were students eating in the classroom

2     when I would walk in.

3          Q.    When did you walk in when they were eating?

4                MR. RAYMOND:    Objection.    She hasn't

11:01:31    5     finished her answer.    Objection.

6                THE WITNESS:    I believe at the time I would

7     walk into the room was around 8:45, 8:50, somewhere in

8     there, so she would be finishing up doing something as I

9     would come in or the kids were getting ready for me to

11:01:48   10     come in to teach them workshop.

11          I remember that the classroom environment

12     there were piles of papers everywhere, there were piles

13     of books, there was a very disheveled classroom library

14     area that I was trying to kind of help clean up, that

11:02:11   15     when I would go to work with students at their desks

16     there would be food in their desks, their materials

17     inside their desks were in disarray.    Those are some of

18     the things that I remember.

19     BY MR. ROGERS:

11:02:28   20          Q.    Do you remember talking to Ms. Reyes about

21     any of that?

22          A.    Yes.

23          Q.    Okay.    What do you recall about that?

24          A.    I recall mostly talking to her about just

11:02:43   25     why don't -- you know, posting some expectations for

34

1          MR. ROGERS:  All right.  So let's mark as

2     Exhibit 2 a PAR referral.

3               (Whereupon, Exhibit 2 was marked for

4     identification.)

**11:05:45**  5          MR. RAYMOND:  She will give you a copy.

6     BY MR. ROGERS:

7          Q.  Do you recognize any part of Exhibit 2?

8          A.  Yes.  I recognize the statement of concern.

9          Q.  Okay.  Prior to -- well, why did you prepare

**11:06:08** 10    the statement of concern?

11         A.  Because I was concerned.

12         Q.  Why?

13         A.  I was concerned because when I was in

14    Margaret's classroom I was concerned that she needed

**11:06:23** 15    additional support, support beyond what I could give

16    her in her classroom environment and her classroom

17    management.

18         Q.  Did you tell her that you were going to seek

19    support for her?

**11:06:38** 20         A.  No.

21         Q.  Did you tell anybody that you were going to

22    seek support for her?

23         A.  No.

24         Q.  Did you consider that your PAR referral or

**11:06:47** 25    your statement of concern was supportive?

37

1         MR. RAYMOND:  Objection.  Vague and

2    ambiguous.

3         THE WITNESS:  My statement of concern was

4    made in order to provide Margaret with additional

**11:07:08**  5    support through the Peer Assistance and Review Program

6    where teachers get intensive coaching in a particular

7    area that they might be struggling with.

8         The choice of my statement and the choice of

9    the way that my concern is written was to -- was to be

**11:07:34**  10    sure that she would receive the extra support.

11    BY MR. ROGERS:

12      Q.  Did you realize when you wrote it that you

13    were asking for a PAR referral?

14      A.  Yes.

**11:07:42**  15      Q.  Did you realize when you wrote it that there

16    is a huge stigma attached to PAR referrals?

17      A.  No.

18      Q.  You didn't know that?

19      A.  No.

**11:07:53**  20      Q.  Okay.  Do you know what the impact on a

21    teacher is in terms of a PAR referral in terms of

22    vulnerability to being terminated?

23      A.  No.

24      Q.  You don't know that?

**11:08:04**  25      A.  No.

38

Margaret Reyes v. San Francisco Unified School District                    Lisa Levin

1       Q.   How long were you a PAR coach?

2       A.   For three years.

3       Q.   How many people?

4       A.   Probably 36 teachers.

11:08:11   5       Q.   How many survived?

6       A.   24 -- 34.   34.

7       Q.   34 stayed with the district?

8       A.   Yes.

9       Q.   For how long?

11:08:19  10       A.   I don't have that -- I don't know.  Beyond,

11   you know, multiple years.

12       Q.   When you wrote this statement of concern,

13   had you spoken to anybody about it ahead of time?

14       A.   No.

11:08:42  15       Q.   Did you talk to Mr. Zapien about it?

16       A.   No.

17       Q.   So the first -- the only person you talked

18   to about it was -- what's her name? -- Hobbs?

19       A.   So I -- yes.

11:08:57  20       Q.   Okay.  What did -- what was unsafe about the

21   classroom?

22       A.   There were a number of materials throughout

23   the classroom, just stacks of paper throughout the

24   classroom, stacks of books throughout the classroom.

11:09:15  25   The place where a classroom library was supposed to

39

Margaret Reyes v. San Francisco Unified School District                    Lisa Levin

1    be, the bookshelf was -- was kind of not safe.  It

2    was about, like, to kind of fall down.

3            Students -- there were no expectations for

4    students' behaviors that were established.  There

11:09:36    5    were no routines or procedures in place so students

6    were, like, leaving the classroom to use the restroom

7    at times.  Students were getting into altercations in

8    the classroom.  Arguments.  There were no -- there

9    was no physical fights but just arguments.  There was

11:09:57    10   one student in particular who did have emotional

11   needs, and he would throw tantrums.  There was --

12        Q.  Okay.  Keep going.

13        A.  No.  I will stop.

14        Q.  Was there --

11:10:15    15           MR. RAYMOND:  You were going to say

16   something.  If you have additional information, you

17   have got to provide a complete answer.

18           THE WITNESS:  Okay.  There was food that had

19   been left in the classroom in students' desks that

11:10:29    20   was unwrapped or half eaten.

21   BY MR. ROGERS:

22        Q.  The kid who threw tantrums, what was your

23   recommendation as to how to deal with that?

24        A.  I don't remember if we had a specific

11:10:48    25   conversation about that student.  I remember -- a

40

1    or routines in place.

2        Q.   Aside from your going in and giving

3    demonstrations -- which is all you remember.   Right?

4        A.   (Nods head.)

11:15:58  5        Q.   You never observed her teaching, did you?

6        A.   No, I did not.

7        Q.   Okay.  And when you came in and children

8    were eating, could that have been because you came in

9    at the end of the lunch period?

11:16:11  10        A.   No.

11            MR. RAYMOND:   Objection.  Calls for

12    speculation.

13            THE WITNESS:   I was not there at the end of

14    the lunch period.

11:16:17  15    BY MR. ROGERS:

16        Q.   So you're always there at 8:30 in the

17    morning?

18        A.   I was there between -- I can't tell you

19    exactly, but it was probably between 8:45 and 10:30.

11:16:28  20    It was always in the morning.

21        Q.   Okay.  And during that time there's no

22    snacks or anything like that?

23        A.   Not scheduled.

24        Q.   Now, when you said that students were not

11:16:47  25    aware of expectations for behavior or learning, did

45

Margaret Reyes v. San Francisco Unified School District                    Lisa Levin

1    you ask the students what their expectations were?

2    How did you do that?

3        A.  No, I did not ask them.

4        Q.  Well, how did you come to that conclusion?

11:17:00   5        A.  When I was demonstrating lessons, I had to

6    set the expectations.

7            So I started in her room in the middle of

8    the year so I had to tell students how I expected

9    them to come to the carpet because the first time I

11:17:17   10   did it thinking maybe they knew how to come to a

11   carpet for a lesson or where to sit on the carpet I

12   noticed very quickly that they didn't know, that they

13   were talking, that they didn't know where to sit.

14   They were arguing about where they were sitting.

11:17:35   15           So I recognized that I had to set the

16   expectations; when you come to the carpet, this is

17   what it sounds like, here is where you must sit, here

18   is your seating chart of where you must sit when you

19   come to the carpet, when you share with a partner,

11:17:51   20   this is what it looks like.

21           So I had to establish all of the

22   expectations and reinforce them because it was

23   apparent to me by their behavior that that had not

24   been done.

11:18:01   25       Q.  Did you talk to Ms. Reyes about how she

46

1    controlled them?

2        A.  I spoke -- I gave Ms. Reyes suggestions.

3        Q.  Did you ask her --

4        A.  I don't recall.

11:18:15  5        Q.  Okay.  Were there options to a PAR referral?

6             MR. RAYMOND:  Objection.  Vague and

7    ambiguous.

8             THE WITNESS:  I don't know what you mean by

9    that.

11:18:32  10  BY MR. ROGERS:

11        Q.  Is there somebody like an instructional

12    reform facilitator?

13        A.  I -- there is an instructional reform

14    facilitator.

11:18:45  15        The reason why I referred Margaret for PAR

16    is -- is to give her additional support that was

17    intensive.  So to me what I saw was that Margaret

18    potentially needed very -- some support that was long

19    term and intensive, someone to work with her one on

11:19:13  20  one for a long period of time, and I felt like PAR

21    was the best vehicle to get her that intensive

22    continuous support.

23        Q.  And you don't know as you sit here today

24    that if a teacher is referred to PAR that even if

11:19:32  25  they survive it they are more vulnerable to being

47

1  terminated?

2      A.  No, I don't know that.  I see it -- I mean,

3  I was working as a PAR coach.  I saw it as a

4  tremendous system of support for teachers.

11:19:47  5      It's the only system in our district that

6  provides teachers who are experienced with -- with

7  intensive coaching and support.  There's no other

8  system currently that does that.

9      Q.  Okay.  How many times have you referred

11:20:21  10  teachers to PAR?

11      A.  As a teacher referring other teachers,

12  Margaret was the first time I had done it.

13      Q.  Did you tell Mr. Zapien that you had

14  referred her to PAR?

11:20:43  15      A.  No.

16      Q.  He testified that -- that he found out.  Did

17  he find out from you?  Did you tell him at some

18  point?

19      A.  I don't remember.  I don't recall any

11:20:56  20  conversation.  I know that I did not tell him

21  beforehand.  And I even checked with the PAR office

22  that it would be anonymous.

23      My referring Margaret was anonymous so I --

24  I don't know -- I don't recall if I did have a

11:21:20  25  conversation with him at some point or anything.  I

48

Margaret Reyes v. San Francisco Unified School District                    Lisa Levin

1      Q.  Bad enough for the need of a PAR referral to

2  support him?

3      A.  I don't know anything about Dan Brady and

4  PAR.

11:23:54  5      Q.  Okay.  When you talked to Jessica Hobbs,

6  what did you tell her about the PAR referral?

7      A.  I just -- I gave her the form, which --

8  which this isn't the form.  There is a formal form, I

9  believe.  I don't know.  Maybe there's not.  Maybe I

11:24:22  10  don't remember.

11      Q.  Did you just give her this statement?

12      A.  Yes.  I didn't say anything more.  I said, I

13  am sorry if I am putting you in a difficult position.

14  She was going to talk to her -- the union about what

11:24:35  15  she was supposed to do next.

16      I had gotten the information that after I

17  gave her this that she was required to give it to

18  Richard and that was the -- that was all and that it

19  was anonymous.

11:24:55  20      Q.  Do you need to have a credential or

21  certificate to be a reading specialist?

22      A.  Yes.

23      Q.  When did you get one?

24      A.  Well, I went to San Francisco State and was

11:25:11  25  in the master's program there, and I don't remember

51

1          I, ERIN SHANNON, Certified Shorthand Reporter,

2    License No. 11355, do hereby certify:

3          That, prior to being examined, the witness named

4    in the foregoing deposition, to wit, LISA LEVIN, was by

5    me duly sworn to testify the truth, the whole truth and

6    nothing but the truth:

7          That said transcript was taken down by me in

8    shorthand at the time and place therein named and

9    thereafter reduced to computerized transcription under

10   my direction.

11         I further certify that I am not interested in the

12   event of the action.

13

14              WITNESS this 20th day of July, 2012.

15

16          _____

17              ERIN SHANNON, CSR NO. 11355

18

19

20

21

22

23

24

25

02/10/2012 12:00 IFAX sffax@jacksonlewis.com → Reception ☒003/005
HUMAN RESOURCES        Fax 4152416147      Feb 10 2012 11:57am  P003/005

APR-19-2011  13:32                                                    P.02

2010-2011
20090810

SFUSD

PAR Referral by U.E.S.F. Building Representative

Margaret Burns                    2/25/11
Name of Teacher Being Referred      Date of Submission of Statement

Hillcrest Elementary School        2/24/11
School                              Date of Discussion with UESF Building Rep
                                    and Principal

Statement of Concern based on classroom performance not solely on issues of neglect of duty or
misconduct: (Attach most recent summary evaluation and written classroom performance reports)

Please see attached.

UESF Building Rep Signature:    Date:  2/25/11

Principal's Response to this referral: Agree ☑ Disagree ☐   Please explain:

Please see attached

Principal's Signature: Date:

Date Given to Building Rep:  _____

Date Given to PAR              By: UESF Building Rep _____
Co-Chairs:                      or
                               By: Principal _____

*Peer Assistance and Review (PAR) Program*                    page 1 of 66

EXHIBIT
2
Levis

SFUSD 000188

02/10/2012 12:00 IFAX sffax@jacksonlewis.com HUMAN RESOURCES   Fax 4162416147   → Reception   Feb 10 2012 11:57am   P004/005

H-R-19-2011  13:32   P.03

Statement of Concern:

Ms. Burns does not exhibit a classroom environment that is safe or engages all students. The physical environment is in disarray and materials are disorganized. There are no classroom routines or procedures in place. Students are not aware of expectations for behavior or learning.

SFUSD 000189

# MILLER & COMPANY REPORTERS

**CERTIFIED TRANSCRIPT**

UNITED STATES DISTRICT COURT

NORTHER DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARGARET REYES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| SAN FRANCISCO UNIFIED SCHOOL | ) |
| DISTRICT, | ) |
| | ) |
| Defendant. | ) |
| ------------------------------------ | ) |
| | |
| SAN FRANCISCO UNIFIED SCHOOL | ) |
| DISTRICT, | ) |
| | ) |
| Counterclaimant, | ) |
| | ) |
| v. | ) |
| | ) |
| MARGARET REYES, RICHARD M. | ) |
| ROGERS, THE LAW OFFICE OF | ) |
| RICHARD M. ROGERS, AND DOES 1 | ) |
| THROUGH 10, INCLUSIVE, | ) |
| | ) |
| Counterdefendants. | ) |
| | ) |
| ------------------------------------ | ) |

DEPOSITION OF: PHILIP MILLER

TAKEN ON:     June 8, 2012

NO. 13136     **REPORTED BY:**     JULIE ALFORD
CSR No. 7694

Los Angeles                     San Francisco
800.487.6278

1    time in conversation -- I'll probably let you go

2    ahead, but then I'm going to have to state the

3    question again, and you're going to have to answer

4    again.  So try to be disciplined about that.  By the

14:09:50  5    same token, if I interrupt an answer, let me know,

6    and I'll stop and you can finish your answer.

7        A.   Okay.

8        Q.   What else can I tell you?

9             It's important to answer out loud.  "Uh-huh"

14:10:06  10   doesn't work that well for depositions.  So yeses and

11   noes.  I'm probably not going to ask that many yes

12   and no questions, but we'll see.

13             I don't want you to guess.  If you don't

14   remember something, let me know that.  If you have a

14:10:18  15   vague recollection, I'm entitled to it.  Just let me

16   know that it's a vague recollection.  But if you

17   really don't remember, let me know that.  All right?

18       A.   Okay.

19       Q.   When did you first meet Margaret Reyes?

14:10:34  20       A.   Whatever the year was that she first started

21   at Hillcrest.

22       Q.   All right.  Are you employed by the San

23   Francisco Unified School District?

24       A.   Yes.

14:10:44  25       Q.   All right.  How long have you been so

6

1    employed?

2        A.    Since 1991.

3        Q.    What do you teach?

4        A.    I teach middle school, all middle school

5    subjects to home school students.

6        Q.    All right.  Are you still associated with

7    Hillcrest?

8        A.    No.  I work for a Student Support Services.

9        Q.    All right.  During the 2008, 2009 school

10   year, were you on the Union Building Committee?

11       A.    For part of the year.

12       Q.    Okay.  What part of the year was that?

13       A.    The fall.

14       Q.    While you were on the Union Building

15   Committee, did Ms. Reyes' name come up?

16           MS. MAYLIN:  Well, it's vague.

17           THE WITNESS:  If that was the year that she

18   was having her problems there, I would say yes.

19   BY MR. ROGERS:

20       Q.    Okay.  Who was on the committee?

21       A.    I believe it was myself and June Dayao.

22       Q.    All right.  Anybody else on the committee at

23   that time?

24       A.    Not that I remember.  I don't remember.

25       Q.    Okay.  How did Ms. Reyes' name come up?

7

1          MS. MAYLIN:  And I don't want to interrupt,

2     but I just want to let you know, Mr. Miller, that if

3     you need to take a break at any time --

4          THE WITNESS:  Okay.  Sure.

14:12:44    5          MS. MAYLIN:  -- to stretch your legs, relax,

6     whatever --

7          THE WITNESS:  Sure.

8          MS. MAYLIN:  -- just let us know, and --

9     and, you know, we can take ten breaks if you need to.

14:12:46   10          THE WITNESS:  Yeah.

11          MS. MAYLIN:  Okay?

12          THE WITNESS:  Thanks.

13          MS. MAYLIN:  All right.

14          THE WITNESS:  Thanks.

14:12:54   15          I don't have like a really clear

16     recollection of the specific time, fall of 2008, and

17     what was being discussed at the Union Building

18     Committee at that time.  I'd need some kind of frame

19     of reference, I think.

14:13:22   20     BY MR. ROGERS:

21          Q.  Okay.  Let me see if I can do that.

22              How long were you on the committee?

23          A.  I was the building rep and automatically on

24     the committee for about at least five years.

14:13:42   25          Q.  So you left the committee after the fall of

8

| | |
|---|---|
| 1 | 2008? |
| 2 | A.   I believe that's when I left Hillcrest. |
| 3 | Q.   Okay. |
| 4 | A.   In early January 2009, I believe. |
| 14:14:00  5 | Q.   Okay.  Let me check a date. |
| 6 | Okay.  So you left in January 2009. |
| 7 | Do you remember the paint incident involving |
| 8 | Ms. Reyes? |
| 9 | A.   Yes. |
| 14:14:16  10 | Q.   Okay.  Did her name come up at the |
| 11 | committee, the UBC, prior to the paint incident? |
| 12 | A.   I don't remember.  I remember the paint |
| 13 | incident. |
| 14 | Q.   How often did the committee meet? |
| 14:14:38  15 | A.   I think we met once a month. |
| 16 | Q.   Is there somebody named -- I'm trying to |
| 17 | remember.  Jill Levin, was she part of the committee? |
| 18 | A.   Jill? |
| 19 | Q.   Was it Jill or -- |
| 14:14:56  20 | MS. MAYLIN:  I think it was -- was it Lisa? |
| 21 | Lisa Levin? |
| 22 | BY MR. ROGERS: |
| 23 | Q.   Lisa Levin, was she part of the committee? |
| 24 | A.   Lisa Levin, I don't remember that name. |
| 14:15:06  25 | Q.   Okay. |

9

1

2

3

4

5        I, JULIE ALFORD, Certified Shorthand

6  Reporter, License No. 7694, do hereby certify:

7        That, prior to being examined, the witness

8  named in the foregoing deposition, to wit,

9  PHILIP MILLER, was by me duly sworn to testify the

10 truth, the whole truth and nothing but the truth:

11        That said transcript was taken down by me in

12 shorthand at the time and place therein named and

13 thereafter reduced to computerized transcription

14 under my direction.

15

16        I further certify that I am not interested

17 in the event of the action.

18

19        WITNESS this 26th day of June, 2012.

20

21

22  _____

23          JULIE ALFORD

24

25

                                                    32

1          UNITED STATES DISTRICT COURT

2        NORTHERN DISTRICT OF CALIFORNIA

3                 ---oOo---

4

MARGARET REYES,                    )
5                                  )
              Plaintiff,           )
6                                  )
              vs.                  )  No.
7                                  )  CV 11-04628 YGR
SAN FRANCISCO UNIFIED SCHOOL       )
8   DISTRICT,                      )
                                   )
9              Defendant.          )
                                   )
10  and                            )
                                   )
11  AND RELATED CROSS-ACTION       )
                                   )
12  _____

13                 ---oOo---

14

15        **VIDEOTAPED DEPOSITION OF**

16           **MARGARET REYES**
                **VOLUME 1**
17

18        Monday, April 16, 2012

19

20

21

22

23

24
REPORTED BY:  JOHN P. SQUIRES, CMR, CRP
25            CSR No. 2001

                                        1

**CERTIFIED
COPY**

1    again encourage you to have your testimony today be

2    as careful and thoughtful as possible and also to

3    make sure that you understand the question before you

4    answer.  All right?

5    A.        (Nodding head).

6    Q.        You got to say yes if --

7    A.        Yes.  I understand.

8    Q.        Okay.  Why don't we just go ahead and start

9    then.

10            Ms. Reyes, how long have you been employed

11   by the School District?

12   A.        Since 2002.

13   Q.        What was your first position with the

14   district?

15   A.        I taught at summer school from I believe

16   late June of 2002 until I believe -- you know, it may

17   have actually been early June of 2002 until probably

18   mid July of 2002.

19   Q.        Okay.  What grade level; do you recall?

20   A.        I believe it was a three/four split, meaning

21   combination grades, but the children -- three/four

22   was actually their grade they had been in.  They were

23   going into -- they were approaching grades four and

24   five.

25   Q.        I see.  Okay.

                                                    11

1    A.       I did, yes.

2    Q.       So that puts us up to summer, 2003.

3    A.       Yes.

4    Q.       Did you return to Yehall Chin?

5    A.       Yes.

6    Q.       Okay.  For 2003/2004?

7    A.       Yes.

8    Q.       The same grade level, first grade?

9    A.       No.

10   Q.       What grade level?

11   A.       Second grade.

12   Q.       Do you recall who the site administrator was

13   there?

14   A.       Yes.

15   Q.       What was his or her name?

16   A.       Allen A. Lee.

17   Q.       Okay.  How long did you stay at that site?

18   A.       I believe until June of 2005.

19   Q.       Where did you go?

20   A.       I went to Hillcrest Elementary School.

21   Q.       Why did you leave that site?

22   A.       Because Mr. Lee gave me paperwork that I was

23   consolidated.

24   Q.       Okay.  I understand that the consolidation

25   process is voluntary, teachers need to volunteer for

17

1    Q.        Okay.  And when you joined Hillcrest?

2    A.        Kindergarten.

3    Q.        And how long were you at Hillcrest?

4    A.        Six years.

5    Q.        Okay.  And when you left Hillcrest what

6    grade level were you teaching?

7    A.        Second grade.

8    Q.        And what site are you currently at?

9    A.        Lawton Alternative.

10   Q.        What grade level do you teach?

11   A.        Second grade.

12   Q.        Ms. Reyes, do you have a preference for the

13   grade level that you teach?  Do you feel that you're

14   most suited for a particular grade level?

15   A.        Well, I'm credentialed to teach kindergarten

16   through eighth grade.  I'm very open to teaching

17   various grade levels.

18   Q.        Okay.  So you don't have a preference per se

19   or you don't feel more suited to a particular grade

20   level?

21   A.        I'm not sure I completely understand that

22   question.

23             I feel qualified to teach kindergarten

24   through eighth grade, so I do feel that I'm very able

25   and willing to teach any of the grades.

                                                    25

1    of the settlement.   I know I'm not supposed to talk

2    about the settlement.

3    Q.        Okay.

4    A.        Because something was going to arbitration.

5    But I dropped it as part of....

6    Q.        Okay.  And you think that that might be the

7    one that you dropped?

8    A.        Yes.  And I -- it might be and there might

9    have been another one, but I don't know if it was

10   filed on behalf of me or if the union filed it.

11   Q.        Okay.  Did that have to do with, as far as

12   you understood, how the consolidation process worked

13   in general, not specific to --

14   A.        Correct.  No.  It was specific that the

15   rules weren't followed.

16   Q.        Okay.  All right.  But in any event the

17   consolidation stuck and you did go to Hillcrest?

18   A.        If you say "stuck," sure.

19   Q.        Sure.

20   A.        I mean I moved.

21   Q.        Okay.  When was the next grievance that you

22   were involved in?

23   A.        I think it was the one in 2008.

24   Q.        Okay.  What was the subject matter of that?

25   A.        That a -- again it's quite a long story.  Do

34

1    you want the abbreviated version or the --

2    Q.        Oh, yes.

3    A.        The abbreviated version.

4    Q.        Just what was the subject matter?

5    A.        That the principal failed to -- or actually

6    refused to respond to a situation that he knew was

7    dangerous to a child he knew had a history of extreme

8    violence --

9    Q.        Okay.

10   A.        -- and put myself and, more importantly,

11   other students and the child himself in great danger.

12   Q.        And what was the outcome of that grievance?

13   A.        I'm still not sure.  I was told by the union

14   that he was going to be more safe, that there was

15   going to be more systems in place for responding,

16   that he had -- I, quite frankly, don't know what the

17   outcome was.

18   Q.        Okay.  As far as you know, that grievance

19   isn't still pending, is it?

20   A.        I would highly doubt that.

21   Q.        Okay.  So the grievance has resolved, you're

22   just not sure exactly how.  Is that fair?

23   A.        It's resolved somewhere.

24   Q.        Okay.  All right.  And so that was four

25   grievances.  Have there been others?  What's the next

1    one?

2    A.        There have.

3    Q.        Okay.  Next.

4    A.        Shortly after that, I felt that -- well, not

5    felt.  Mr. Zapien disciplined me for an art project

6    and I was told that the discipline, if you will, was

7    not going to result in anything on my file and what

8    have you.  He told our then union rep that he had

9    been told by Central Office to move forward with

10   putting this on my file -- it was over paint -- and

11   after he had said to our union rep that it was going

12   to be a verbal warning.  I was very disenchanted with

13   the way he disciplined me and lectured me in front of

14   students.  I was also very disenchanted with the fact

15   that other people had done the same art project.

16   Q.        Okay.

17   A.        And --

18   Q.        Ms. Reyes, you need to just keep my question

19   in mind.

20   A.        Okay.

21   Q.        If I want elaboration, I'll ask you.

22   A.        Okay.

23   Q.        But in any event, so you grieved the form of

24   discipline, fair enough?

25   A.        I did.  And I grieved -- we grieved the

                                                          36

1    fact -- I guess that would be the way it would -- I'm

2    a little unclear on the -- your statement you just

3    made.  Did I grieve the form of discipline?  I think

4    we grieved his behavior and the fact that I was

5    disciplined for it.

6    Q.        Okay.  And what was the outcome of that

7    grievance, as far as you know?

8    A.        So the union made a bargain, if you will,

9    when they do those to only leave it on my file for

10   two years.  However, when I went back more than two

11   years later it was still on my file.

12   Q.        You're talking about the letter?

13   A.        Correct, and the fact that I had been

14   disciplined and warned.  And I went back like more

15   than two years later and it was still on my file.

16   Q.        All right.  And do you recall what year it

17   was that that occurred?

18   A.        It was December of 2008.

19   Q.        Okay.  Any grievances after that?

20   A.        Um-hmm.

21   Q.        Okay.  Next one.

22   A.        Okay.  I think the next one -- and I think

23   the last one -- was 2010.

24   Q.        What was the subject matter?

25   A.        The -- sorry.  The evaluation that Ms.

                                                           37

1    information that you have that would establish that

2    Mr. Lee told Mr. Kwan about the settlement?

3    A.        No, I can't.

4    Q.        Okay.  You don't have any information, do

5    you, to refute that Mr. Kwan learned about the

6    settlement through a public record, do you?

7    A.        I do not.

8    Q.        Okay.  And do you know that the School

9    District necessarily publishes settlement

10   information, including the amount, when they come out

11   of closed session in their public minutes?

12   A.        I know that now.

13   Q.        Okay.  Do you have any reason to refute that

14   Mr. Kwan learned that information from some source

15   other than Mr. Lee?

16   A.        I don't.

17   Q.        Okay.  So how else was the agreement,

18   Exhibit 2, violated, ma'am?

19   A.        Can you define "Exhibit 2"?

20   Q.        The settlement agreement.

21            MR. ROGERS:  The settlement agreement.

22            THE WITNESS:  Oh.  Sorry.

23            Well, when I went to look at my personnel

24   file, it was -- the agreement was in my personnel

25   file.  This document was in my personnel file.

80

**CONFIDENTIAL SECTION OF TRANSCRIPT**

1              MS. MAYLIN:   Q.   When was that?

2    A.        February of 2011.

3    Q.        Okay.  And why is it that in February, 2011

4    you reviewed your personnel file?  Any particular

5    reason?

6    A.        Um-hmm.

7    Q.        Go ahead.

8    A.        We were getting ready to go to the

9    arbitration regarding the grievance about my

10   evaluation and it was suggested to me that I go look

11   at my personnel file, so I did.  And it was also

12   suggested to me that I go and make sure that the --

13   Q.        That two-year letter?

14   A.        Yes, that it was off.

15   Q.        Okay.

16   A.        Because the two years had ended briefly

17   before that.

18   Q.        When did the two years end; do you recall?

19   A.        Well, it would have been December of 2010

20   would have been the two-year mark.

21   Q.        So you found the settlement agreement.  This

22   Exhibit 2 was in your file?

23   A.        It appeared to be.  I wasn't able to make

24   photocopies.  I was only allowed to make five

25   photocopies and I chose to make other photocopies

                                                          81

**CONFIDENTIAL SECTION OF TRANSCRIPT**

1    that seemed even more alarming than this.

2    Q.        But you recall that the agreement was there?

3    A.        What appeared to be, yes.  Again, I wasn't

4    able to make photocopies, but it did look like this,

5    it had my signature and -- it was quick, but yes.

6    Q.        Okay.  And did it also have your attorney's

7    signature?

8    A.        To the best of my knowledge, yes.

9    Q.        All right.  All right.  So the settlement

10   agreement is in your file.  And was there anything

11   else in your file that you believed violated the

12   agreement?

13   A.        Yes.

14   Q.        What else?

15   A.        Ms. Sagastume ordering people to put it on

16   my PeopleSoft file.  There was an actual e-mail where

17   she said "Please make this note in PeopleSoft," and

18   then there was an actual photocopy of my PeopleSoft

19   folio, if you will, and it said at the bottom

20   "per" --

21   Q.        Settlement agreement?

22   A.        Correct.

23   Q.        Okay.  All right.  Anything else?

24   A.        Yes.

25   Q.        What else?

82

**CONFIDENTIAL SECTION OF TRANSCRIPT**

1   A.        There was an e-mail from a person I didn't

2   know at the time, I am familiar with the person now,

3   from Mike Quinn.  I wasn't familiar with who he was.

4   But making reference to the settlement agreement.

5   And it was sent to various people.  So there was

6   reference to the settlement agreement and it was on

7   my file and printed out and....

8   Q.        Okay.  And isn't it true that the e-mail

9   from Mike Quinn was part of an e-mail string that

10  included the Angie Sagastume e-mail?  Do you recall

11  that?

12  A.        I think you're right.

13  Q.        Okay.

14  A.        Yes, that's my understanding.

15  Q.        All right.  So that's one document.

16            So now we've got the settlement agreement in

17  the file, an e-mail from Sagastume with the e-mail

18  from Quinn.  Anything else in your file that you

19  believe?

20  A.        And a separate actual photocopy of the

21  PeopleSoft folio.

22  Q.        Anything else?

23  A.        Specifically about the settlement agreement?

24  Q.        Um-hmm.

25  A.        That's all I can remember at this time.  But

83

**CONFIDENTIAL SECTION OF TRANSCRIPT**

1    A.       I was under time constraints for various

2    reasons and there was a lot of paper in the file

3    and --

4    Q.       Okay.  Again, ma'am, I didn't ask how many

5    papers were in the file.  I'm asking what you can

6    recall.

7             MR. ROGERS:  Time for a break.  I need a

8    bathroom break.

9             MS. MAYLIN:  Okay.  That's fine.

10            THE VIDEOGRAPHER:  3:27 p.m.

11            We're on the record.  It's 3:32 p.m.

12            MS. MAYLIN:  Q.  Okay.  Did you again after

13   March, 2011 review your personnel file?

14   A.       No.

15   Q.       So the last time you looked at it there was

16   still the Sagastume e-mail with the Quinn e-mail and

17   you think probably the PeopleSoft snapshot?

18   A.       Yes.

19   Q.       Okay.  All right.  Do you believe the

20   settlement agreement has been violated in any other

21   way?

22   A.       Yes.

23   Q.       In what other way do you believe it's been

24   violated?

25   A.       Up until I think about a month ago they

                                                    85

**CONFIDENTIAL SECTION OF TRANSCRIPT**

1   honored my seven days that they were supposed to

2   credit me.  I'm fairly certain they did it March 1st

3   of 2012.

4   Q.      So they were untimely doing that?

5   A.      I think six or seven years is untimely by

6   most people's....

7   Q.      Any other way that the agreement has been

8   violated as far as you know?

9   A.      Yes.

10   Q.      How else?

11   A.      Many years I would get something in the mail

12   stating that my seniority date was different than

13   what my actual seniority date is and I would fax

14   something back saying my seniority date is 8-21-02,

15   and then the next year I would get something saying

16   it was December of '02 or March of '03 or whatever.

17   So, yes.  They didn't -- they didn't honor the part

18   where it said my seniority date will be reflective of

19   what is actually my seniority date, 8-21-02.

20   Q.      Okay.

21   A.      And that was my seniority date.  It wasn't

22   part of the legal settlement agreement.  They made a

23   mistake.  Anyways....

24   Q.      And when is the last time you received a

25   communication from the District that contained a

86

**CONFIDENTIAL SECTION OF TRANSCRIPT**

1   misstatement of your seniority date?

2   A.        For sure, I got one in 2010.

3   Q.        Okay.

4   A.        And 2009 and 2008.

5   Q.        So the last one that you can recall you got

6   in 2010?

7   A.        Yes.  I might have gotten one in 2011.  I'm

8   not positive.

9   Q.        Okay.  And it is true, isn't it, that as to

10  the seniority date and the credit for -- seven days

11  was it?

12  A.        Um-hmm.

13  Q.        -- the untimeliness of getting those days

14  put on your record or the seniority date being

15  correctly referenced in your personnel records, you

16  haven't suffered any detriment because of those

17  things, have you?  You haven't been subjected to a

18  layoff or consolidation or lost any benefits --

19  A.        No.

20  Q.        -- correct?

21  A.        No, I've not.

22  Q.        Okay.  Okay.  And do you have any reason to

23  state -- do you have any information on which you

24  base a belief that any of those errors contained in

25  your personnel file, including personnel records,

87

**CONFIDENTIAL SECTION OF TRANSCRIPT**

1   one?

2   A.        Sure, if that would help.

3   Q.        Well, can you answer now?  If you can, then

4   I won't have to go one by one.

5   A.        I can't answer now.  I mean you're asking --

6   Q.        Let me go one by one.

7   A.        Okay.

8   Q.        Okay.  You have a recollection that in

9   February, 2011 you observed the settlement agreement,

10  Exhibit 2, in your personnel file, right?

11  A.        Um-hmm.

12  Q.        Do you have any reason to believe that it

13  was placed there outside of a bureaucratic error,

14  somebody put it in there by mistake?

15  A.        I haven't a clue.  How would I --

16  Q.        That answers my question.  Let's go on to

17  the next one.

18            Do you have any reason to say that the Quinn

19  and Sagastume e-mail got placed in your personnel

20  file by any other reason other than a mistake?

21            MR. ROGERS:  Objection, attorney-client

22  privilege.

23            Do not include in your answer any

24  communications from me.

25            THE WITNESS:  That's a pretty hard mistake

                                                    89

**CONFIDENTIAL SECTION OF TRANSCRIPT**

1    to make, Ms. Maylin.

2             MS. MAYLIN:   Q.   And I'm asking for

3    information.

4    A.        I can't imagine that that was a mistake.

5    Q.        For example, you read something, you heard

6    something, somebody told you I heard that Mr. Lee

7    announced in a meeting that he put that e-mail in her

8    file in order to ruin her future with the District.

9             Do you have something to say that that

10   document got in your personnel file for any reason

11   other than it was a mistake?

12   A.        The words on the documents gave me reason to

13   believe it wasn't a mistake.

14   Q.        Any other basis to believe that it wasn't a

15   mistake?

16   A.        Printing something out and putting it in a

17   personnel file is fairly deliberate.

18   Q.        Okay.   Anything else?

19   A.        The way that Mr. Zapien treated me was --

20   Q.        Do you believe that Mr. Zapien facilitated,

21   directed that that e-mail be placed in your personnel

22   file?

23   A.        I don't know.

24   Q.        Okay.   It is true, isn't it, that you don't

25   have any understanding at all of how that got placed

                                                       90

1    in your personnel file or why?  Correct?

2    A.       I wasn't there when it was put in, so --

3    Q.       So is the answer correct?

4    A.       I don't know.

5    Q.       And you don't know, do you, why it is that

6    your seniority date -- that it took some years for

7    your seniority date to get sorted out, correct, on

8    your personnel records?

9    A.       It took more than some years.  It took --

10   Q.       Regardless of the time --

11   A.       It took attorney letters and it still

12   didn't.

13   Q.       Okay.

14   A.       So it did start to feel deliberate when it's

15   brought to people's attention through letters, more

16   than one, that --

17   Q.       Other than the time, ma'am, do you have any

18   reason --

19   A.       The time and the amount of requests.

20   Q.       Okay.  Anything else on that issue?

21   A.       The things that Mike Quinn said about me in

22   the e-mail.

23   Q.       Did he say to all staff, make sure that Ms.

24   Reyes' seniority date never gets corrected?

25            Do you have any basis to believe that the

91

**CONFIDENTIAL SECTION OF TRANSCRIPT**

1    seniority date took as long as it did to get

2    corrected because of someone's specific intent to

3    hurt you?

4    A.      I don't know.

5    Q.      Okay.  Same question as to the late credit

6    of you getting those seven days credit.  Do you have

7    any information that it took as long as it took for

8    you to get those seven days put on your personnel

9    record because of somebody's ill motive specifically

10   to hurt you?

11          MR. ROGERS:  Again objection

12   attorney-client, privilege.

13          In your answer don't include communications

14   from me.

15          MS. MAYLIN:  Q.  Go ahead.  Do you know?

16   A.      Well, I know that it was part of the

17   settlement agreement and it wasn't honored.

18          I mean the motive at this point, Ms.

19   Maylin --

20   Q.      I'm asking about the motive.  Do you know

21   anything about the motive?  Yes or no.

22   A.      That specific motive, no.

23   Q.      All right.  Do you believe the agreement has

24   been violated in any other way than what we've

25   discussed?

92

**CONFIDENTIAL SECTION OF TRANSCRIPT**

1   Q.        Okay.  So back to the PAR-referral

2   situation.  You had multiple conversations with

3   Dennis Kelly about you being referred to the PAR

4   program, didn't you?

5   A.        "Multiple" meaning more than one?

6   Q.        Oh, yes.

7   A.        Yes, I had more than one.

8   Q.        Okay.  How many would you say?

9   A.        I'm not sure.

10  Q.        Too many to count?

11  A.        No.  I would be able to count it if I had

12  been keeping track, but I wasn't.

13  Q.        Can you give me an estimate of how many?

14  A.        I cannot.

15  Q.        Okay.  And you certainly understood, if not

16  at the beginning of your knowledge that you were

17  referred to the PAR program, certainly after speaking

18  with him on multiple times, that you were referred to

19  the PAR program by -- it was a UBC referral, correct?

20  A.        No.  He told me it was Mr. Zapien --

21  Q.        Okay.

22  A.        -- that wrote the letter and that referred

23  me and that Mr. Zapien used the UBC route is what he

24  told me.

25  Q.        Okay.  Did you receive letters that refute

                                                          94

1    notice letters from?  Did you get them in the mail --

2    A.       After that, after I called Dennis Kelly,

3    they sent it to me in school mail several days after.

4             Dennis Kelly admitted that they hadn't

5    notified me.  That was not....

6    Q.       Okay.  When you got the letters, did you see

7    that the letters were dated before your meeting with

8    Ms. Gonzalez?

9    A.       They were dated a couple days before the

10   meeting, before she showed up at my school.

11   Q.       Did you ever get them through your home

12   mail?

13   A.       I did not.

14   Q.       And the only way you got them through your

15   school mail was from Mr. Kelly?  Or do you know?

16   A.       I think it came from HR.

17   Q.       Okay.  All righty.  In any event, you had

18   many conversations with Mr. Kelly about it.

19            Did you have another conversation with Ms.

20   Gonzalez about it?

21   A.       Yes.

22   Q.       Okay.  She met with you again after that

23   first meeting?

24   A.       Yes.

25   Q.       Okay.  And at some point you reached an

1    agreement through your union that the PAR program

2    would not be the involuntary process but the

3    voluntary process.  Does that resonate with you or

4    no?

5    A.        Yes.

6    Q.        Okay.  And what's your understanding of how

7    that agreement came to be?

8    A.        It's quite a narrative.  Do you want a

9    narrative?  It's quite a long narrative.

10   Q.        Okay.  Was that something you negotiated

11   with Mr. -- through Mr. Kelly with the District?

12   A.        Yes, yes.

13   Q.        Okay.  And so you were part of the voluntary

14   PAR program?

15   A.        Yes.

16   Q.        Are you still on that voluntary PAR program?

17   A.        No.

18   Q.        Okay.  When did it end?

19   A.        Either October or November or December of

20   2011.

21   Q.        And who was your PAR coach, Ms. Reyes?

22   A.        Ms. Victoria Gonzalez.

23   Q.        Did you communicate with anybody else about

24   the PAR process other than Ms. Gonzalez and Mr. Kelly

25   and Mr. Brill?

102

1    certainly didn't get any benefit from the process,

2    did you?

3    A.        I might have -- I don't -- I don't know that

4    that's fair to say.

5    Q.        Okay.  What benefit do you believe you may

6    have gotten from the process?

7    A.        When I started working with Ms. Gonzalez,

8    she was -- she gave me a little wind -- or a little

9    chime that was quite nice and I still use it, a

10   little chime that you chime.

11   Q.        Okay.

12   A.        She told quite engaging stories about her

13   teaching years.  She told very engaging stories about

14   her life as a teacher.  She told engaging stories

15   about her life in general.

16   Q.        And did any of those stories benefit you in

17   any way?  Were you able to apply anything that you

18   heard or learned from this experienced coach to where

19   it benefitted you at all?

20   A.        Yeah.

21   Q.        Okay.  In looking back -- it was a

22   couple-of-month process, was it?

23   A.        Um-hmm.

24   Q.        That's a yes?

25   A.        Yes.

```
1                    CERTIFICATE OF REPORTER
2          I, JOHN P. SQUIRES, a Certified Shorthand
3   Reporter, hereby certify that the witness in the
4   foregoing deposition, MARGARET REYES, was duly sworn
5   by me; that the testimony of said witness was taken
6   down in shorthand by me at the time and place herein
7   stated; that the testimony of said witness was
8   thereafter reduced to typewriting, by computer, under
9   my direction and supervision.
10         I further certify that I am not of counsel
11  or attorney for any of the parties to said cause, nor
12  in any way interested in the outcome of this cause
13  and I am not related to any of the parties thereto.
14         I declare under penalty of perjury that the
15  foregoing is true and correct.  I have hereunto set
16  my hand on April 23, 2012.
17              _____
18              John P. Squires, CSR No. 2001
19
20
21
22
23
24
25
                                                    110
```